UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

ANTONIO MARQUES SMITH,

                              Plaintiff,

         v.                                        Case No. 18-cv-1569-pp

JOHN KIND, JAY VAN LANEN,
TIMOTHY RETZLAFF, ALEXANDER BONIS,
JOHN DIEDRICK, and COLE MEYER,
                              Defendants.

---

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 32) AND DISMISSING CASE

---

Plaintiff Antonio Marques Smith, who is confined at the Wisconsin Secure Program Facility and who is representing himself, filed an amended complaint alleging that the defendants violated his constitutional rights. Dkt. No. 9 at 3. The court screened the amended complaint under 28 U.S.C. §1915A and allowed the plaintiff to proceed on Eighth Amendment excessive force claims against defendant Jay Van Lanen for using an incapacitating agent on the plaintiff to gain compliance from him to leave his cell; against defendants Alexander Bonis, John Diedrick and Cole Meyer for the way they escorted the plaintiff to the nurse's station and a cell in control status; and against defendant John Kind, for authorizing the use of force (Dkt. No. 10 at 12-14); and an Eighth Amendment conditions-of-confinement claim against defendants Van Lanen and Timothy Retzlaff for the conditions of the cell while the plaintiff was in control status (Dkt. No. 10 at 14-15). The defendants have filed a motion for summary judgment. Dkt. No. 32.

1

## I.    Procedural History

The plaintiff filed a forty-five-page complaint against twenty-two named defendants and some Doe defendants, alleging excessive force in violation of the Eighth and Fourteenth Amendments, retaliation in violation of the First Amendment, violations of the Equal Protection Clause and deliberate indifference. Dkt. No. 1. The court screened the complaint and concluded that it violated Federal Rules of Civil Procedure 18 and 20 because it brought unrelated claims against unrelated defendants in a single lawsuit. Dkt. No. 8. The court gave the plaintiff the opportunity to file an amended complaint. Id. at 7.

In the amended complaint, the plaintiff alleged that over the course of four days, fifteen defendants violated his First, Fourth, Eighth and Fourteenth Amendment rights. Dkt. No. 9. He alleged that he had advised the prison that he was on a hunger strike. Id. at 3. The plaintiff alleged that four days in a row, various defendants used physical force to remove him from his cell for the purpose of taking him to see the prison nurse, even though he presented in a submissive position, lying on his stomach with his hands behind his back and his ankles crossed. Id. at 4-6. He asserted that on the fourth day, defendants used incapacitating agents on him despite knowing that he had asthma, used choke holds on him and choke-dragged him into a cell. Id. at 6. Finally, he alleged that some of the defendants had placed him naked into a cold cell for over twenty-four hours and that others issued, and had him found guilty of, a false conduct report. Id. at 7.

Case 2:18-cv-01569-PP   Filed 09/23/22   Page 2 of 41   Document 61

The court did not allow the plaintiff to proceed against the defendants who'd been involved in the cell removals on the first three days. Dkt. No. 10 at 10-12. The court concluded that prison administrators had a right to force an incarcerated person to take nourishment if his hunger strike placed him at serious risk of injury or death, that the plaintiff had alleged the use of only minimal force and that he had not identified any injury he suffered because of that force. Id. The court also dismissed the nurse practitioner whom the plaintiff had sued for allegedly taking a nasal swab, noting that because he was on a hunger strike, the plaintiff did not have a constitutional right to refuse life-saving treatment. Id. at 12. It dismissed the plaintiff's claims regarding the allegedly false conduct report. Id. at 15-16.

The court found, however, that "the events of November 28"—the fourth day—were different. Id.

> . . . There the plaintiff alleges that defendant Van Lanen discovered that using incapacitating agents would trigger the plaintiff's asthma. Dkt. No. 9 at ¶9. The plaintiff alleges that Van Lanen told him he was tired of having to forcibly restrain the plaintiff to take him to the nurse's station, and that defendant Kind had authorized Van Lanen to escalate by using the incapacitating agents. Id. According to the plaintiff, once he put himself into a submissive position (signaling that he was not going to come out of the cell of his own volition), Van Lanen deployed the incapacitating agent. Id.
>
> The plaintiff has alleged that Van Lanen had a malicious and sadistic purpose behind the use of the incapacitating agent to force the plaintiff from his cell—avoiding having to restrain and transport the plaintiff. The plaintiff may proceed on an Eighth Amendment excessive force claim against Van Lanen. He may also proceed on an Eighth Amendment excessive force claim against the three officers who extracted the plaintiff from the cell after Van Lanen deployed the incapacitating agent—Bonis, Diedrick and Meyers. The plaintiff sufficiently alleged a sadistic and malicious purpose when they used a choke hold while he was having trouble breathing; when they

3

made him walk fully nude to the nurse's station, even though he was in a weakened state and suffering an asthma attack; when Van Lanen directed Diedrick to put the plaintiff in a chokehold and when Diedrick yanked the plaintiff's head back and choked him during [the nurse's] examination; and when they choke-dragged him to another cell after his examination. Id. at ¶¶10-15.

The plaintiff also may proceed on an Eighth Amendment claim for excessive force under a theory of supervisor liability against defendant Kind for the November 28 use of the incapacitating agent.

* * * *

The plaintiff alleged that Kind knew about and authorized Van Lanen's plan to use incapacitating agents.

Id. at 12-14.

Finally, the court allowed the plaintiff to proceed on a conditions-of-confinement claim against Van Lanen and Retzlaff based on his allegations about being placed in a cold cell in winter without bedding, clothing or hygiene items for twenty-four hours. Id. at 14.

The plaintiff alleges that he had just been sprayed with an incapacitating agent, was having an asthma attack and was weak from his hunger strike when Van Lanen placed him on "control status," which he asserts means he was denied bedding, clothing and hygiene items to clean off the incapacitating agent. Dkt. No. 9 at ¶15. He alleges that he asked Retzlaff for help, but that after stating that he would talk with Van Lanen, Retzlaff disappeared and never returned. Id. At this stage, the plaintiff sufficiently states an Eighth Amendment conditions of confinement claim against Van Lanen and Retzlaff.

Id. at 14-15.

These are the claims the defendants answered and the claims on which they seek summary judgment—Eighth Amendment excessive force and conditions-of-confinement claims relating to the extraction of the plaintiff from his cell on November 28, 2017.

4

## II.    Facts[1]

The plaintiff was confined in the restrictive housing unit, also known as segregation, at Green Bay Correctional Institution during the events described in the complaint. Dkt. No. 51 at ¶1.

The plaintiff has a history of hunger strikes dating back to 2016. Dkt. No. 34 at ¶10; Dkt. No. 38 at ¶8. His medical records show that in July 2017, he had engaged in a hunger strike during which he refused medical monitoring on a couple of occasions. Dkt. No. 37-1 at 19-20.

In his verified amended complaint, the plaintiff alleged that on October 6, 2017, he "put Green Bay Correctional Institution . . . health service department on notice[] that he was engaged in a hunger strike protest against the conditions of his confinement, and use/misuse and abuse of Solitary Confinement." Dkt. No. 9 at 3. See also, Dkt. No. 37-1 at 18 (Hunger Strike Initial Assessments form, indicating date of notification as "10-6-17").

On October 10, 2017, Nurse Practitioner Peters (not a defendant) conducted the "initial assessment of hunger strike" for the plaintiff. Dkt. No. 34 at ¶11; Dkt. No. 38 at ¶9; Dkt. No. 37-1 at 18. Peters says the plaintiff was classified as "emergent" (which means refusal of fluids for twenty-four hours or food for seventy-two hours) and noted that he had asthma that was controlled, that he was alert, that he was oriented and that he refused a complete physical assessment. Id. At that time, Peters did not see evidence of serious debilitation

_____

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

secondary to lack of nutrition; the plan for treating the plaintiff was to "initiate [a] hunger strike care plan." Id. At that time, the plaintiff refused a complete physical assessment, a systems review or labs.[2] Dkt. No. 37-1 at 18.

The defendants provided a blank copy of Department of Corrections Form DOC-3452. Dkt. No. 37-3 at 4. The form—which has information directed to the incarcerated person and a space for that person to sign and date—reads as follows:

> Not eating food or drinking fluids is unhealthy and may cause short term or long term illness up to and including death.
>
> Not eating or drinking anything may cause death in just a few days.
>
> Drinking fluids and not eating is less dangerous, but can lead to serious illness if continued for days.
>
> Body reactions to starving include: loss of body fluids, dizziness, lightheadedness, weakness, nausea, vomiting, tiredness, sluggishness, irritability, weight loss, low blood sugar, slow heart rate and low blood pressure.
>
> Starving can result in heart damage, kidney damage, and death. Depending on the length of starvation, damage to the heart and kidneys may be permanent.
>
> **Restarting eating and drinking after a period of starvation must be done with caution because if not done appropriately, serious medical complications can occur including sudden death. Contact the Health Services Staff for assistance.**
>
> Staff will observe your weight, temperature, pulse, blood pressure and breathing. You will be examined for signs and symptoms of

---

[2] The defendants state in their proposed findings of fact that the plaintiff "had regularly refused treatment," dkt. no. 34 at ¶12; the placement of this finding implies that the plaintiff had been refusing medical treatment prior to October 10, 2017. The medical records cited in the findings, however, do not cover the weeks prior to October 10, 2017; they start on that date and cover the period through February 23, 2018. Dkt. No. 37-1 at 1-18.

6

starvation, mental illness, and to determine whether or not you are able to make decisions and manage your affairs.

If you are found to be at risk of death or other serious adverse effects due to starvation, legal measures may be taken to allow forced examination by health care providers, forced feeding, forced fluids and hospitalization.

Id.[3]

The medical records show that between June 10, 2017 and November 24, 2017—a period of forty-six days—the plaintiff refused medical monitoring (a hunger strike evaluation). Dkt. No. 37-1 at 12-17. In November 2017, there was no court order in effect requiring forced medical evaluations or forced feeding of the plaintiff. Dkt. No. 34 at ¶18; Dkt. No. 51 at ¶18. The defendants say that in November 2017 (some three or so weeks into the plaintiff's hunger strike) the plaintiff still was required to go to the Health Services Unit (HSU) to refuse medical treatment. Dkt. No. 34 at ¶19. The plaintiff denies this and states that because he was in segregation and unwilling to report to his on-site appointment to refuse a hunger strike evaluation, Department of Correction (DOC) policy and Green Bay segregation practices provided that staff should come to see him face-to-face at his cell with a DOC-322-Refusal of Recommended Health Care form. Dkt. No. 50 at ¶19.

Under DOC, Division of Adult Institutions Policy 500.30.54, Informed Consent and Right to Refuse Treatment, "[a]ll Division of Adult Institution facilities shall ensure all examinations, treatments and procedures are

---

[3] As best the court can tell, the record does not contain a copy of this document signed by the plaintiff.

governed by informed consent practices which support the ethical principles of an inmate patient's right to information and knowledge about healthcare, invasive procedures, and more importantly allows the inmate patient to make an informed decision to consent or refuse the recommended health care intervention." Dkt. No. 37-2 at 1, Ex. 1006-001. The policy also provides:

> Inmate patients are required to report to an appointment for any refusal of health care. For inmate patients unable or unwilling to report to their on-site appointment site (e.g., in segregation or observation status), the ACP or nurse shall see the inmate patient face-to-face to complete the DOC-3220 – Refusal of Recommended Health Care, and file in the Medical Chart, Consents/Refusals Section.

Dkt. No. 37-2 at 11, Ex. 1006 – 011. It provides that an incarcerated patient who refuses care "shall be considered for discussion at multidisciplinary team meetings to reevaluate the treatment plan." Id.

On November 24, 2017—forty-six days into the plaintiff's hunger strike and four days before the date of the incident at issue in the case—the plaintiff was unwilling to report to an on-site appointment for a hunger strike evaluation. Dkt. No. 59 at ¶24. A nurse came to see the plaintiff at his cell with a DOC-3220 Refusal of Recommended Health Care form, which the plaintiff refused to sign. Id.

The plaintiff alleges that on November 25 and 26, 2017, Kind authorized a use of force to remove the plaintiff from his cell because he was unwilling to report to an on-site appointment for a hunger strike evaluation.[4] Id. at ¶26. On

---

[4] The defendants do not dispute this proposed finding of fact, but the incident report Van Lanen prepared implies that Kind authorized the use of force on November 28, 2017. Dkt. No. 35-1 at 2.

8

those dates, a cell extraction team entered the plaintiff's cell while he lay prone on his bed in the "surrendering ritual" with his hands behind his back, legs crossed at his ankles and face turned to the wall. Id. at ¶27. A lieutenant entered the plaintiff's cell with his taser drawn, followed by the cell extraction team officers who placed handcuffs and leg restraints on the plaintiff, secured him in a restraint chair and escorted him to the nurse's station to submit to a hunger strike evaluation. Id. at ¶¶28-29. The plaintiff refused treatment and staff returned him to his cell. Id. at ¶¶29-30. Staff did not use incapacitating agents, electronic control devices or compliance holds during the November 25-26 cell extractions. Id. at ¶30.

The plaintiff alleges that on November 27, 2017, Captain Baumann (not a defendant) authorized a use of force to remove the plaintiff from his cell because the plaintiff was not willing to report to an on-site medical appointment for a hunger strike evaluation. Dkt. No. 59 at ¶31. Van Lanen entered the plaintiff's cell with his taser drawn and the cell extraction team followed him. Id. at ¶33. The cell extraction took place in the same way it did on November 25 and 26; staff restrained the plaintiff and took him to the HSU in the restraint chair, the plaintiff refused treatment from the nurse and staff returned the plaintiff to his cell. Id. at ¶¶33-36. Staff did not use incapacitating agents, electronic control devices or compliance holds during the November 27 cell extraction.[5] Id. at ¶36.

---

[5] At screening, the court did not allow the plaintiff to proceed on any claims related to the allegations from the November 25, 26 and 27, 2017 cell extractions. Dkt. No. 10 at 11-12. The defendants respond to the plaintiff's

9

On November 28, 2017, the date of the incident at issue, Van Lanen told the plaintiff that he would be required to come out of his cell and report to the Health Services Unit (HSU) for a wellness check. Dkt. No. 34 at ¶21. After the plaintiff had refused Van Lanen's request multiple times, Van Lanen assembled an extraction team to remove the plaintiff from his cell. Id. Officer Charles Gulley operated a video camera for the extraction team.[6] Id. at ¶23. Prior to the extraction, Van Lanen summarized on the video why the team was going to extract the plaintiff, indicating that the plaintiff was on hunger strike, needed to report to HSU and had refused to leave his cell as he had done the last four days. Id. at ¶24; Ex. 1004. Van Lanen stated that the plaintiff had "an extensive violent history with assigning hits on the streets to have people killed, assaulting within the prison system and assaulting in general throughout his prison career." Ex. 1004 at 00:27-00:38. Van Lanen stated that Kind had been apprised of the situation; he also explained that the plaintiff was

> very aware of our tactics of entering the cell. He has his neighbors on his right and left side telling him the things we are doing when we're standing outside that cell to enter that cell, now it's become a risk of entering that cell as Mr. Smith does have his property in that cell. He has been positioning himself on the bed but I'm unable to see if he has any weapons made or things like that. So this is Day 5 so Mr. Smith is thinking that we're going to [unintelligible] to get him out of his cell. I'm going to try to get Mr. Smith to come to the door and cuff up; that's an important part of the wellness check is to walk . . . .

proposed findings of fact relating to these dates by asserting what happened on these dates is immaterial to the allegations on which the court allowed the plaintiff to proceed. Dkt. No. 59 at ¶¶27-36.

[6] The defendants submitted the approximately thirty-five-minute video footage of the incident. Dkt. No. 36-1, Ex. 1004.

Id. at 00:48-1:29.

Van Lanen stated that the plaintiff had demonstrated the day before that he could walk, but that he refused to do so. Id. at 1:30-2:45. Van Lanen said that the extraction team would take all safety precautions for staff and that they would take the plaintiff out of the cell to go to HSU for the wellness check. Id. He stated that the plaintiff had a contraindication to incapacitating agents and that Kind had authorized the use of incapacitating agents and electronic control devices. Id. Van Lanen concluded that the team would not use the restraint chair because the plaintiff was physically capable of walking and that they would hopefully gain verbal compliance from the plaintiff to walk to the HSU. Id.

The extraction team walked to the plaintiff's cell and Van Lanen ordered the plaintiff to come to his door so officers could take him to the HSU. Dkt. No. 34 at ¶27; Ex. 1004 at 02:44 to 03:41. Van Lanen repeated this command many times and advised the plaintiff that, if he did not comply, officers could use incapacitating agents to gain his compliance. Dkt. No. 34 at ¶28; Ex. 1004 at 03:41 to 04:21. The plaintiff was lying on his side, covered with a blanket and sheet, when he was awakened by Van Lanen's knock on the cell door. Dkt. No. 59 at ¶54. The plaintiff uncovered himself and went into a prone position on his stomach in the surrendering ritual; he put his hands behind his back, crossed his legs at the ankles and turned his face toward the nearest wall. Id.

The plaintiff refused to answer, so Van Lanen directed Gulley to record the cell through the cell window and asked Team Leader Officer Alex Bonis to

ask the plaintiff to comply. Dkt. No. 34 at ¶29; Ex. 1004 at 04:21 to 04:40. Van Lanen again advised the plaintiff that they would have to employ incapacitating agents if he did not come to the door, and Van Lanen described the physical effects that the incapacitating agents would have on the plaintiff. Dkt. No. 34 at ¶30; Ex. 1004 at 04:57 to 05:10. Van Lanen asked the plaintiff to comply so that officers would not be forced to issue him a conduct report for his actions and warned the plaintiff that if officers had to use incapacitating agents, they would have to conduct a strip search before removing him from his cell. Dkt. No. 34 at ¶31; Ex. 1004 at 05:10 to 05:50. The first time the plaintiff moved after going into the surrendering ritual was to cover his face with a blanket when the cell door trap was opened. Dkt. No. 51 at ¶57; Ex. 1004 at 6:04.

Van Lanen tried multiple times to gain verbal compliance without using force, but the plaintiff covered his face to nullify any incapacitating agent officers might use. Dkt. No. 34 at ¶32; Ex. 1004 at 06:00 to 07:00. Van Lanen warned the plaintiff that his property could get damaged if officers used the incapacitating agent. Dkt. No. 34 at ¶33; Ex. 1004 at 07:00 to 07:25. The plaintiff sat up on the bed, covered his property, laid back down on his bed and covered his face with a blanket. Dkt. No. 34 at ¶34; Ex. 1004 at 7:45 to 08:20. Van Lanen gave the plaintiff several more opportunities to comply, but the plaintiff did not do so; at this point, Van Lanen determined that further verbal communication attempts were futile. Dkt. No. 34 at ¶35; Ex. 1004 at 08:20 to 08:40.

Van Lanen showed the plaintiff the "Mark IX OC Phantom Fogger" and gave the plaintiff further opportunities to comply. Dkt. No. 34 at ¶36. The plaintiff refused and covered his face with bed linen. Id. Van Lanen sprayed a Mark IX controlled burst into the plaintiff's cell. Id.; Ex. 1004 at 08:40 to 08:50.[7] Officers secured the cell's trap door, and Van Lanen ordered the plaintiff to comply with a strip search, which the incarcerated person performs himself. Dkt. No. 34 at ¶37. Bonis took over verbal communication. Id.; Ex. 1004 at 08:50 to 09:00.

The plaintiff had an adverse reaction to the chemical agents, which resulted in him having an asthma attack from a pre-existing medical condition that had caused a contraindication alert to be placed in his medical file, which Van Lanen knew about before he used the chemical agent. Dkt. No. 59 at ¶60, Ex. 1004 at 8:45 to 18:00. For a few minutes, the plaintiff moved around on the floor of the cell, groaning and coughing; at one point, he sat on the end of the bed, rolled onto his back with his feet in the air, then rolled back to a sitting position and onto the floor. Ex. 1004 at 8:45 to 18:00. After a few minutes, the plaintiff complied with Bonis's repeated orders to perform the strip search, removed his clothes and presented himself to be handcuffed before the cell door was opened. Dkt. No. 34 at ¶38; Ex. 1004 at 14:10 to 16:20. Officers secured the plaintiff in handcuffs and opened the cell door. Dkt.

---

[7] The video shows that the single burst was momentary, but several more minutes passed before the plaintiff came to the cell door.

13

No. 34 at ¶39; Ex. 1004 at 16:50 to 17:45. The plaintiff exited the cell completely naked. Dkt. No. 59 at ¶61; Ex. 1004 at 18:10.

According to the defendants, the plaintiff attempted to use "dead weight tactics" (while in a sitting position) and kept his legs directly out in front of him. Dkt. No. 34 at ¶40; Ex. 1004 at 17:50 to 20:00. The defendants state that after the plaintiff refused multiple directives to stand up and comply, Van Lanen instructed staff to apply compliance holds to the plaintiff's "hands area" to gain compliance and safely bring his legs back to apply leg restraints. Dkt. No. 34 at ¶41. Ex. 1004 at 20:00 to 20:45. The defendants also state that staff applied compression holds and the plaintiff moved his legs safely under his body to allow leg restraint application. Dkt. No. 34 at ¶42; Ex. 1004 at 20:45 to 21:15. According to the plaintiff, he did not use dead weight tactics or refuse directives; he asserts that he was in a medically weakened condition and could not move into the position at the requested speed. Dkt. No. 50 at ¶¶40-41. He states that Van Lanen and the officers ignored his medical condition caused by the chemical agents as they applied more force to his wrists. Id.; Smith Decl. at ¶42; Ex. 1004 at 18:11 to 21:15.

Staff placed a clean towel around the plaintiff's groin area for decency. Dkt. No. 34 at ¶43; Ex. 1004 at 21:15 to 21:30. The towel did not cover the plaintiff's buttocks, and his buttocks remained exposed during the escort past other incarcerated persons and staff. Dkt. No. 59 at ¶64.

According to the defendants, the plaintiff continued attempting to use deadweight tactics by keeping his legs locked under his buttocks, forcing staff

14

to support his body weight. Dkt. No. 34 at ¶44. Van Lanen asked the plaintiff multiple times to stand up straight and walk, as he had just done at the cell door for the strip search, to minimize the possibility of staff injuries. Id.; Ex. 1004 at 21:30 to 21:47. Van Lanen explained to the plaintiff that if he did not comply, staff would need to secure his head and arms with escort holds. Dkt. No. 34 at ¶45. The plaintiff refused to acknowledge or comply. Id. Van Lanen ordered staff to secure the plaintiff's arms and apply compliance holds on the plaintiff's hands so the staff member directly behind him could safely secure his head to walk him backwards.[8] Id.; Ex. 1004 at 21:47 to 22:08. As staff positioned themselves in preparation to apply the head hold, the plaintiff stated, "alright, alright I'll walk." Dkt. No. 34 at ¶46. Van Lanen had staff reposition themselves to escort the plaintiff. Id.; Ex. 1004 at 22:08 to 22:30.

The plaintiff began walking but he bent forward at the waist, which put pressure on the shoulder and back areas of the officers who were holding his arms during the escort. Dkt. No. 34 at ¶47. Van Lanen continued to ask the plaintiff to straighten up while walking. Id.; Ex. 1004 at 22:30 to 25:30. The plaintiff states that he leaned forward because he lacked strength to fully support his own weight. Dkt. No. 50 at ¶47.

As they arrived in the "core area," Van Lanen offered the plaintiff a decontamination shower, which the plaintiff refused. Dkt. No. 34 at ¶48; Ex.

---

[8] According to the plaintiff, he was not using deadweight tactics; he says he could not move at the speed and in the manner demanded by Van Lanen and the officers because he was weakened from the asthma attack and had yet to recover his strength to fully support his own weight. Dkt. No. 50 at ¶¶44-45.

15

1004 at 25:30 to 25:43. Van Lanen directed staff to escort the plaintiff to the HSU nurse station for medical evaluation. Dkt. No. 34 at ¶49. Nurse Lemens and Nurse Practitioner Peters offered the plaintiff a medical evaluation. Id.; Ex. 1004 at 25:45 to 27:00. The plaintiff refused medical evaluation, but Peters thought that he may have been in respiratory distress and asked him to raise his head; the plaintiff refused. Dkt. No. 34 at ¶50; Ex. 1004 at 27:00 to 27:15. Van Lanen asked Peters if she needed the plaintiff's head raised to evaluate the situation, and she said she did. Dkt. No. 34 at ¶51; Ex. 1004 at 27:15 to 27:25. Van Lanen directed staff to secure the plaintiff's head for the evaluation. Dkt. No. 34 at ¶52. Peters determined that the plaintiff was not in respiratory distress so he could return to a cell. Id.; Ex. 1004 at 27:25 to 28:00.

The plaintiff's version of this is different. He asserts that Van Lanen directed Bonis to put the plaintiff "into another tactical chokehold," and that Bonis "aggressively yanked Smith's head backwards by his neck, and held the tactical chokehold longer than necessary." Dkt. No. 59 at ¶60. The video does not support the plaintiff's assertions; it shows an officer briefly lifting the plaintiff's head—one hand on his forehead, the other on his chin—Peters briefly looking at the plaintiff's nose while the plaintiff yelled, "I don't want it! I don't want it! I don't want it!" and Van Lanen telling the plaintiff that they were just trying to wipe his nose. Ex. 1004 at 23:15 to 28:00.

Officers escorted the plaintiff from the HSU nurse station to cell 302 and placed him on controlled separation status. Dkt. No. 34 at ¶53; Ex. 1004 at 28:00 to 30:30. When the plaintiff arrived at cell 302, he was assisted to his

knees and staff removed the modesty towel attached to his restraints. Dkt. No. 59 at ¶71; Ex. 1004 at 29:30 to 30:30. Staff removed his leg restraints, and the plaintiff entered the cell completely naked. Id. Officers provided the plaintiff with a cell that included a working toilet and water, and lighting for up to twelve hours of reading. Dkt. No. 34 at ¶55. The parties dispute other conditions of the cell. According to the defendants, the cell was clean and had adequate ventilation with heat. Id. According to the plaintiff, cell 302 was "unsanitary" and the ventilation system did not provide adequate heat. Dkt. No. 50 at ¶55.

Van Lanen informed the plaintiff that he could have a decontamination shower and soap at any time. Dkt. No. 34 at ¶56. Van Lanen also told the plaintiff that he would be back to talk to him about clothing and other items. Id.; Ex. 1004 at 31:25 to 31:35. After staff secured the plaintiff in cell 302, Van Lanen had staff report to the core area for debrief, and he briefed the camera on the extraction. Dkt. No. 34 at ¶57; Ex. 1004 at 31:36 to 34:10.

According to the defendants, after completing the camera debrief, Van Lanen went the plaintiff's cell and explained what he would need to do to come off control status. Dkt. No. 34 at ¶58. The defendants state that the plaintiff was walking around the cell, refused to listen to Van Lanen's explanation of how to come off control and stated that he would make staff suit up every day until they got a court order for him. Id. at ¶59. According to the plaintiff, Van Lanen did not come to speak with him after he completed the debrief. Dkt. No.

50 at ¶58. The plaintiff also states that he did not need to hear how to come off control status because he was familiar with control status policy. Id. at ¶59.

Van Lanen placed the plaintiff into controlled restrictive housing, also known as controlled separation status. Dkt. No. 59 at ¶73. When incarcerated persons are placed on control status, all their clothes are taken away for their own safety and they are offered security linen (a smock/kilt) for privacy reasons.[9] Dkt. No. 34 at ¶60. Incarcerated persons can always ask for hygiene items, and they will be provided by the staff; these are not entered on the DOC-112 (Observation of Inmate) form. Id. at ¶61.

According to the defendants, the plaintiff was offered a smock, a security mat, soap and toilet paper and he refused to accept any property; he was informed that he could have the property whenever he wanted. Dkt. No. 34 at ¶62. According to the plaintiff, Van Lanen and Retzlaff did not offer him a

---

[9] The plaintiff denies this fact because he says the policy states that incarcerated persons shall be provided with clothing consistent with the level of risk, and that Van Lanen did not articulate the risk the plaintiff posed in control status that warranted him not to be provided with clothing versus a smock/kilt in any document. Dkt. No. 50 at ¶60. The plaintiff states that in accordance with policy, he should have had all his normal clothing because no one alleged that he posed a risk to himself or staff. Id. The plaintiff cites to Wis. Admin. Code §DOC 303.74. That section states in part that a "security supervisor may order into controlled separation any inmate in segregated status who exhibits disruptive, destructive, or out of control behavior." Wis. Admin. Code §DOC 303.74(1). It also states, "(a) The institution shall provide inmates in controlled separation all of the following: 1. Clean mattress. 2. Sufficient light by which to read at least 12 hours per day. 3. Sanitary toilet and sink. 4. Adequate ventilation and heating. 5. Clothing consistent with the level of risk. 6. Essential hygiene supplies. 7. Nutritionally adequate meals." Wis. Admin. Code §DOC 303.74(2)(a). Finally, it provides: "(b) While an inmate is acting in a disruptive manner, the institution shall maintain close control of all property in subd. (a) 1. [Clean mattress], 5. [Clothing], and 6. [Meals]." Wis. Admin. Code §DOC 303.74(2)(b).

18

smock, security mat, soap, toilet paper or any property items. Dkt. No. 50 at ¶62; Dkt. No. 59 at ¶¶77-81. During a security round check of incarcerated persons around 3:30 p.m. on November 28, 2017, Retzlaff spoke with the plaintiff. Dkt. No. 59 at ¶82. The plaintiff requested from Retzlaff a smock, clothing, security mat/mattress, bedding, soap, toilet paper and cleaning supplies or to be moved to a clean cell. Id. at ¶84. The plaintiff also told Retzlaff that the vent inside the cell was blowing out cold air and he needed to be moved to warmer cell. Id. Retzlaff told the plaintiff that he wanted to speak with Van Lanen before giving him property or moving him. Id. at ¶¶85-86. Retzlaff did not return to speak with the plaintiff nor did he provide the plaintiff with property he requested or move him to a clean and warm cell. Id. at ¶87.

At 3:41 a.m. on November 29, 2017, Lieutenant Wickman (not a defendant) offered the plaintiff a smock contingent on the plaintiff agreeing to not refuse to exit his cell to see HSU staff to be evaluated for his hunger strike, but the plaintiff refused to accept that condition. Dkt. No. 59 at ¶¶92-93.

The plaintiff was placed into control status on November 28, 2017 at 12:00 p.m. or 12:15 p.m. Dkt. No. 34 at ¶63. Officers checked on the plaintiff every thirty minutes and noted his activities. Id. at ¶64; Dkt. No. 37-4. The observation record indicates that the plaintiff spoke to both Retzlaff and Wickman at the door of the cell. Dkt. No. 37-4 at 2. It shows that at various times during the next approximately twenty-three hours, staff observed the plaintiff standing, standing by the door, sitting on the bed and talking to staff. Dkt. No. 37-2 at 3-5. Staff removed the plaintiff from control status at 11:00

19

a.m. on November 29, 2017. Dkt. No. 34 at ¶65. The total time spent in control status was about twenty-three hours. Id. at ¶66.

The plaintiff provided Green Bay historical weather data showing a high temperature of 57° and a low temperature of 25° on November 28 and 29, 2017, during the time the plaintiff was on control status. Dkt. No. 50 at ¶100. The defendant provided historical weather data showing that the high was 57° and the low was 39°. Dkt. No. 39-4 at 1. The plaintiff says that he was in a steel cell completely naked with a vent that produced cold air and asserts that he was extremely cold. Dkt. No. 50 at ¶68.

As discussed above, Van Lanen stated on the video that one of the reasons for putting together an extraction team to remove the plaintiff from his cell was his assaultive behavior within the prison system. Van Lanen repeated this in the incident report he wrote the day after the extraction, explaining that on November 28th, he'd talked to the plaintiff about the need to conduct a cell search and a wellness check, but that "[a]fter several attempts [he] felt verbal communication was exhausted." Dkt. No. 35-1 at 2. Van Lanen explained that he'd contacted Kind and expressed concerns for the plaintiff's wellness, as well as concern that "[the plaintiff] is aware of the past four days of entering the cell the same way and the other offenders on the wing informing [the plaintiff] of our positioning." Id. Van Lanen expressed concern for the safety of the staff "if we had to enter the cell as [the plaintiff] has an assaultive history with having great bodily harm done to people on the streets while incarcerat[ed] and [the plaintiff's] violent history." Id. He explained that Kind authorized the use of

force, "not limited to Incapacitating agents, Electronic control devices or enter the cell if needed." Id. Van Lanen also explained that he'd contacted a nurse in the health services unit and learned that the plaintiff had a "contra indication to Incapacitating agents." Id.

The plaintiff disputes that Van Lanen had any information that the plaintiff had ever assaulted any incarcerated person or staff member at Green Bay or any other prison. Dkt. No. 59 at ¶44. The plaintiff provided Van Lanen's responses to the plaintiff's requests for admission. Dkt. No. 56-1 at 114-131. That document contains the following requests and responses:

> 17. Admit that [the plaintiff] have no record while housed as an inmate within the Department of Corrections/Division of Adult Institutions for assaults against an employee.
>
> **Response: DENY. Plaintiff's history of disruptive conduct, group resistance, threats, sexual conduct and unpredictable behavior were a concern for staff safety. Continued refusal to comply with staff directives causing staff to enter the cell displays behavior leading up to a set up for assaultive behavior. At the time of the incident on 11-28-17, VanLanen lacked knowledge as to Plaintiff's behavior at other Institutions.**
>
> 18. Admit that [the plaintiff] have no record while housed as an inmate within the Wisconsin Department of Corrections Division of Adult Institutions for an assault against an inmate.
>
> **Response: After reasonable inquiry, Defendant VanLanen lacks sufficient knowledge or information to be able to ADMIT or DENY this request.**
>
> 19. Admit that on November 28, 2017 you (Jay Van Lanen) didn't have any confirmed information that [the plaintiff] had ever ass[a]ulted anyone other than has alleged crimes to which he had been convicted of.
>
> **Response: ADMIT but ALLEGE Plaintiff's history of disruptive conduct, group resistance, threats, sexual conduct and unpredictable behavior were a concern for staff safety.**

21

**Continued refusal to comply with staff directives causing staff to enter the cell displays behavior leading up to a set up for assaultive behavior.**

Id. at 118-119.

## III.   Analysis

A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322. To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. Brummett v. Sinclair Broad. Grp., Inc., 414 F.3d 686, 692 (7th Cir. 2005).

When considering a motion for summary judgment, the court "draw[s] all reasonable factual inferences in the light most favorable to . . . the party that did not move for summary judgment." Watters v. Homeowners' Ass'n at Preserve at Bridgewater, No. 19-3499, 2022 WL 4128529, at *1 (7th Cir. Sept. 12, 2022) (citation omitted).

B.    Discussion

1.    *Excessive Force Claims*

"After incarceration, only the "'unnecessary and wanton infliction of pain'" constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Ingraham v. Wright, 430 U.S. 651, 670 (1977) (quoting Estelle v. Gamble, 429 U.S. 97, 103 (1976)). "What is necessary to establish an 'unnecessary and wanton infliction of pain,' . . . varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 320 (1986)). In cases involving

the use of excessive force, the question is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 7. Factors for courts to consider in determining whether the use of force was wanton and unnecessary include "the need for an application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" Id. (quoting Whitley, 475 U.S. at 321).

Not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9. "The use of de minimis force, so long as it 'is not of a sort repugnant to the conscience of mankind,' is not of Eighth Amendment concern." Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009) (quoting Hudson, 503 U.S. at 9-10). On the other hand, there is no requirement that a plaintiff must allege a "significant injury" to state an excessive force claim. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (citing Hudson, 503 U.S. at 7). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. This is true whether or not significant injury is evident." Hudson, 503 U.S. at 9. "A court should not recreate the disapproved 'significant injury' requirement by classifying all consequences it deems 'insignificant' as de minimis harms." Guitron v. Paul, 675 F.3d 1044, 1046 (7th Cir. 2012).

> A judgment of imprisonment strips a prisoner of th[e] right to be let alone, and many other interests as well. See *Hudson v. Palmer*, 468 U.S. 517 . . . (1984). Custodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled

people who disdain authority (that's how the prisoners came to be there, after all) is to be manageable. When a physical injury occurs as the result of force applied in the course of prison operations . . . , the courts should approach the matter as *Whitley* and *Hudson v. McMillian* direct, rather than trying to classify injuries as *de minimis*.

Id.

Because "[i]njury and force . . . are only imperfectly correlated," it is the force "that ultimately counts." Wilkins, 559 U.S. at 38. Put another way, "pain, not injury, is the barometer by which we measure claims of excessive force." Lewis, 581 F.3d at 475 (citing Hudson, 503 U.S. at 9). "What matters—and what will generally be the decisive factor in cases such as this—is the mindset of the individual applying the force." Id. at 476.

In evaluating the state of mind of the person applying the force, a court must consider the circumstances in which the force was applied. Prisons, like jails, "are dangerous places, and it is without rational dispute that security officials are justified in maintaining decorum and discipline among inmates to minimize risks to themselves and other prisoners." Lewis, 581 F.3d at 476 (citing Bell v. Wolfish, 441 U.S. 520, 546 (1979)). Given that, the Seventh Circuit has explained the importance of incarcerated persons following orders:

Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them . . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

Lewis, 581 F.3d at 476-77 (quoting Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984)).

25

When an order is given to an inmate there are only so many choices available to the correctional officer. If it is an order that requires action by the institution, and the inmate cannot be persuaded to obey the order, some means must be used to compel compliance, such as a chemical agent or physical force. While [some have] suggested that rather than seek to enforce orders, it was possible to leave the inmate alone if he chooses not to obey a particular order, and wait him out, experience and common sense establish that a prison cannot be operated in such a way.

Discipline in a maximum security correctional institution no doubt is difficult, but it is essential if the prison is to function and provide for the case, safety and security of the staff and inmates. Services to provide food, clothing, health, medical, cleaning, laundry and all other services would come to end without discipline. Mob rule would take over. There would not, and could not, be any protection for staff or inmates.

Soto, 744 F.2d at 1267.

"Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Hudson, 503 U.S. at 6 (internal citations and quotations omitted.) See also Soto, 744 F.2d at 1269 (according prison officials wide-ranging deference to adopt and execute policies "needed to preserve internal order and discipline"). "[P]rison guards may use chemical sprays when reasonably necessary to subdue recalcitrant prisoners, for orders must be obeyed, and there are only so many choices available to correctional officers when inmates refuse." Kervin v. Barnes, 144 F. App'x 551, 552 (7th Cir. 2005) (citing Soto, 744 F.2d at 1267; Stringer v. Rowe, 616 F.2d 993, 998 (7th Cir. 1980)).

In the case of a hunger strike, prison administrators have additional obligations. The Seventh Circuit has held that while "[f]ree people who are sane

26

have a liberty interest in refusing life-saving treatment . . . and likewise in refusing to eat," incarcerated persons either "don't have such an interest, or it is easily overridden." Freeman v. Berge, 441 F.3d 543, 546 (7th Cir. 2006).

> The reasons are practical. (No longer does one hear that prisoners must not be allowed to evade punishment by killing themselves and thus "cheating the gallows.") If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the other prisoners. Prison officials who let prisoners starve themselves to death would also expose themselves to lawsuits by the prisoners' estates. Reckless indifference to the risk of a prisoner's committing suicide is a standard basis for a civil rights suit. E.g., *Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484 (7th Cir 2001).

> *   *   *   *   *

> So at some point in [the appellant's] meal-skipping the prison doctors would have had a duty and certainly a right to step in and force him to take nourishment. Knowing this, the prison has a policy of requiring a prisoner who has skipped all his meals for three consecutive days to be inspected by employees of the prison's health service to make sure he isn't seriously endangering his health.

Id. at 547.

The defendants argue that the force they used on November 28, 2017 was a good-faith attempt to get the plaintiff to comply with the order to come to the door of his cell, rather than a malicious and sadistic attempt to cause the plaintiff harm. The record evidence fully supports this argument. The plaintiff had been on a hunger strike for almost fifty days. In the four days prior to November 28, 2017, he had refused to leave his cell to go to the wellness check appointment, forcing officers to enter his cell and take him to the appointments (and when he arrived at the appointments, the plaintiff had refused the wellness checks). On November 28, 2017, the plaintiff refused for a fifth day to

27

go to the appointment. The video shows that the defendants—particularly Van Lanen and Bonis—tried repeatedly to get the plaintiff to come to the cell door on his own. After Van Lanen told the plaintiff that he needed to come to the cell door, Van Lanen and then Bonis repeated the order over and over. They explained to him the consequences of his failure to comply with the order—they could be forced to use incapacitating agents, they could be forced to write the plaintiff a conduct report, if sprayed the plaintiff would have to undergo a strip search and be put on control status, that the spray could damage the plaintiff's property. Van Lanen told the plaintiff that he was aware that the plaintiff had a medical contraindication for incapacitating spray and told the plaintiff—several times—that he did not want to be forced to use the spray. Van Lanen described the physical effects of incapacitating agents on a person's body. The only effect of any of this ordering, pleading, persuading and reasoning was to cause the plaintiff to put his bed linens over his face and to cover up his property.

Eventually, the defendants released a single, swift burst of incapacitating agent through the meal trap in the cell door. The plaintiff reacted to the incapacitating agent by moving to the floor, coughing, groaning, moving around on the floor and the bed. But it took him several minutes to comply with orders to remove his clothes and come to the cell door. Bonis and Van Lanen repeatedly told the plaintiff that the sooner he removed his clothes and came to the door, the sooner the discomfort would be over with and he could get a shower.

28

Eventually, the plaintiff removed his clothes and came to the door. He turned around and put his hands through the trap to be cuffed. The officers then opened the cell door, restrained the plaintiff's legs and positioned a towel over his groin area. It appears from the video that the plaintiff was not making efforts to support himself; he and the defendants dispute whether he was deliberately making himself a dead weight so that it would be harder for officers to restrain him and take him to the health services staff. Either way, Van Lanen reacted only by repeatedly advising the plaintiff to stand up, so that the officers would not be forced to make him walk backward or to use compliance holds. Van Lanen warned the plaintiff when he was going to direct officers to use compliance holds; at least once, as officers were positioning themselves to apply a head hold, the plaintiff obviated the need for the hold by agreeing that he would walk. The officers supported the plaintiff's weight all the way down the hall to the health services unit. They supported him during the brief interaction with the health services staff; as the court has noted, at one point, one officer held the plaintiff's head by the forehead and chin so that the nurse could inspect his nose (and so that Van Lanen could wipe it). The video shows no chokeholds, no dragging the plaintiff by the neck.

Nothing in the almost thirty-five-minute video of the November 28, 2017 incident shows any evidence of malicious or sadistic behavior by any of the officers involved. Van Lanen and Bonis tried multiple forms of reasoning to convince the plaintiff to follow the order to come to the cell door of his own volition. Only when several forms of reasoning failed did they utilize one burst

of incapacitating spray and compliance holds on the plaintiff's legs (to apply restraints) and his arms (to move him down the hallway). See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (where a reliable videotape clearly captures an event in dispute and blatantly contradicts one party's version of the event so that no reasonable jury could credit that party's story, the court should not adopt that party's version of the facts for the purpose of ruling on motion for summary judgment). After viewing the video, no reasonable jury could conclude that the defendants acted maliciously and sadistically, rather than with the level of force necessary to get the plaintiff to comply with their reasonable orders.

The plaintiff's argument goes beyond the assertion that officers maliciously used an incapacitating agent, chokeholds and other malicious force to remove him from the cell. He contends that the decision to require him to come to his cell door so that he could walk to the HSU to refuse treatment was unreasonable and against DOC policy. The plaintiff believes that DOC policy required HSU staff to come to his cell "face-to-face" so he could refuse treatment, because he was in segregation and unwilling to leave his cell. Policy 500.30.54, §VIII(L) says that an incarcerated person who refuses treatment must report to an appointment to do so. Dkt. No. 37-2 at 11. It says that for those incarcerated patients who are unable or unwilling to report to the appointment site, the advanced care provider or nurse "shall see the inmate patient face-to-face" to fill out the refusal of care form. Id. The policy does not explicitly prevent security staff from requiring an incarcerated person to walk

30

to the HSU to refuse treatment. But even if Van Lanen's decision to require the plaintiff to walk to the HSU violated DOC policy, a violation of prison policy does not equate to a violation of the plaintiff's constitutional rights. See Williams v. Mierzejewski, 401 F. App'x 142, 144 (7th Cir. 2010) ("Prison procedures themselves are not substantive liberty or property interests that are protected by due process, *see Shango v. Jurich*, 681 F.2d 1091, 1100-01 (7th Cir. 1982), and a violation of state laws or regulations is not a basis for a federal civil rights suit, *see Guajardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010); *Domka v. Portage Cnty., Wis.*, 523 F.3d 776, 784 (7th Cir. 2008)").

The plaintiff asserts that because on previous days when he'd refused to go to the wellness appointment either an HSU staff member had come to the cell or he had been removed from the cell without the use of incapacitating agents or electronic devices or compliance holds, the decision to do something different on November 28, 2017 was unreasonable and thus involved excessive force. He implies that the defendants should have continued sending an HSU staff member to the cell door, or continued entering his cell and removing him via the restraint chair, indefinitely and thus avoided using the incapacitating agent. But Van Lanen explained in the video, and in his incident report, his concerns with following that course of conduct. He believed—accurately or inaccurately—that the plaintiff had a history of problematic behavior. On the video and in the report he referenced assaults in prison; in the discovery responses he referenced "disruptive" and "unpredictable" behavior. The plaintiff

31

had learned over the previous four days the staff's routine for removing him from his cell, with help from his neighbors to the right and left of him. Van Lanen was concerned that entering the plaintiff's cell, where the plaintiff had his property, was becoming more and more risky for staff given the plaintiff's familiarity with the routine. And, as Van Lanen noted, the plaintiff's ability, or lack of ability, to walk was part of the wellness check.

More to the point, as an incarcerated person, the plaintiff did not have the authority to dictate how the prison staff should maintain security and order. The plaintiff was required to comply with Van Lanen's and Bonis's orders to come to his cell door, whether he agreed with their orders or their reasoning. Van Lanen and Bonis gave him multiple chances to do so and advised him of the consequences of his failure to comply. Once it was clear that the plaintiff was not going to comply of his own volition, he did not get to choose how the officers gained his compliance, nor did he have a constitutional or other right to insist that they ignore his refusal to comply. Chemical agents may be used against prisoners who refuse to follow orders, although such force should not be "exaggerated or excessive" and should generally follow "adequate warning[s]." Soto, 744 F.2d at 1270-71.

Nor does the fact that Van Lanen knew that the plaintiff had a contraindication to incapacitating agents show that the defendants used excessive force against him. Van Lanen told the plaintiff that he knew about the contraindication. He (and Bonis) provided the plaintiff with multiple opportunities to avoid being subjected to the incapacitating agent. The plaintiff

32

could have complied with the order to come to the cell door and avoided being exposed to the spray, presumably avoiding the ensuing asthma attack. After the asthma attack, when the officers took him to the nursing station, the plaintiff refused examination and treatment, shouting repeatedly that he didn't want it. Van Lanen's telling the plaintiff that he knew of the contraindication was not malicious and sadistic; it was an effort to get the plaintiff to comply with Van Lanen's orders without forcing Van Lanen to use the spray that could (and did) cause an asthma attack.[10]

Kind approved the use of an incapacitating agent based on the information Van Lanen provided. There is no evidence that Kind acted maliciously or sadistically. Van Lanen used the incapacitating agent (after giving the plaintiff multiple warnings and opportunities to comply with his orders) to gain the plaintiff's compliance with his orders, not to maliciously and sadistically harm him; the video demonstrates that Van Lanen and Bonis were trying to *avoid* having to use the spray and avoid harming the plaintiff. The court will grant the defendants' motion for summary judgment as to the plaintiff's excessive force claims against Kind and Van Lanen.

Bonis, Diedrick, Meyer and Van Lanen worked together to restrain the plaintiff and escorted him to the HSU, then to his cell in control status. The video demonstrates that the defendants exhibited patience and professionalism

---

[10] "Asthma, depending on its degree, can be a serious medical condition." Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001). While the video reflects the plaintiff coughing and groaning, and with spit coming out of his mouth, there is no indication that he was unable to breathe during the incident.

33

while restraining the plaintiff and escorting him down the hallway. Although the plaintiff states that officers used chokeholds, the video does not support this assertion. After viewing the video, a reasonable fact finder could not conclude that the defendants used excessive force in restraining the plaintiff, escorting him to the HSU or while he was in the HSU. The court will grant the defendants' motion for summary judgment on the plaintiff's excessive force claim against Bonis, Diedrick and Meyer.[11]

## 2. *Conditions of Confinement Claim*

To establish a constitutional violation with respect to prison living conditions, the plaintiff must be able to demonstrate that both: (1) the conditions were so adverse that they deprived him "of the minimal civilized measure of life's necessities" (the objective prong) and (2) the defendant acted with deliberate indifference with respect to the conditions (the subjective prong). Townsend v. Fuchs, 522 F.3d 765, 773 (7th Cir. 2008) (quoting Farmer v. Brennan, 511 U.S. 832, 834 (1994)). The necessities of life include

---

[11] The plaintiff has asserted that he was walked down the cell block hallway naked in front of other inmates and staff. This is not a claim of excessive force, but a strip search may violate the Eighth Amendment "if it is 'conducted in a harassing manner intended to humiliate and cause psychological pain.'" May v. Trancoso, 412 F. App'x 899, 902-03 (7th Cir. 2011) (quoting Mays v. Springborn, 575 F.3d 643, 649 (7th Cir. 2009)). There is no evidence that the strip search, or the walk down the cell block hallway, was conducted to harass or humiliate the plaintiff or to cause him psychological pain. Had he complied with Van Lanen's order to come to the cell door and to walk with the officers to the HSU staff, the plaintiff would not have been required to take his clothes off or to walk naked down the hallway. He was required to remove his clothes because they were contaminated with the incapacitating agent. And although the plaintiff was naked for the walk from his cell to the medical staff, the defendants provided him with a towel to cover his groin area and were grouped tightly around his sides and rear as the group moved down the hallway.

"reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." Gray v. Hardy, 826 F.3d 1000, 1005 (7th Cir. 2016) (quoting Lewis v. Lane, 816 F.2d 1165, 1171 (7th Cir. 1987)). Although "extreme deprivations are required," Delaney v. DeTella, 256 F.3d 679, 683 (7th Cir. 2001), and "routine discomfort[s]" are not enough to state a conditions of confinement claim, Hudson, 503 U.S. at 9, "[s]ome conditions . . . may establish an Eighth Amendment violation in combination when each alone would not do so," and other conditions that may not be sufficiently serious for a short period of time "can become an Eighth Amendment violation . . . if endured over a significant time." Gray, 826 F.3d at 1005 (citations omitted). "Deliberate indifference . . . means that the official knew that the inmate faced a substantial risk of serious harm, and yet disregarded that risk by failing to take reasonable measures to address it." Townsend, 522 F.3d at 773. Establishing that an official acted negligently is not enough to show a constitutional violation. "Instead, the inmate must show that the official received information from which the inference could be drawn that a substantial risk existed, and that the official actually drew the inference." Id.

The defendants contend that the plaintiff's conditions of confinement claim fails as a matter of law. Dkt. No. 33 at 19. They assert that Van Lanen offered the plaintiff a smock, security mat, soap and toilet paper but that the plaintiff refused to accept any property; they say that the plaintiff was informed that he could have the property whenever he wanted. Dkt. No. 34 at ¶62. The

plaintiff denies that Van Lanen offered him a smock, security mat, soap, toilet paper or any property items. Dkt. No. 50 at ¶62; Dkt. No. 59 at ¶¶77-81.

Van Lanen placed the plaintiff in the cell at around 12:30 p.m. on November 28. Dkt. No. 37-4 at 2. Around 3:30 p.m. the same day, the plaintiff requested from Retzlaff a smock, clothing, security mat/mattress, bedding, soap, toilet paper and cleaning supplies or to be moved to a clean cell. Dkt. No. 59 at ¶84. The plaintiff also told Retzlaff that the vent inside the cell blew cold air and he needed to be moved to a warmer cell. Id. Retzlaff told the plaintiff that he wanted to speak with Van Lanen before giving him property or moving him. Id. at ¶¶85-86. Retzlaff did not return to speak with the plaintiff on November 28, 2017, nor did he provide the plaintiff with property he requested or move him to a different cell. Id. at ¶87.

About twelve hours later—at 3:41 p.m. on November 29—another officer offered the plaintiff a smock on the condition that he not refuse to leave his cell to see HSU staff to be evaluated for his hunger strike, but the plaintiff did not accept the smock. Id. at ¶¶92-93.

The plaintiff was in the cell for twenty-two hours and forty-five minutes. Dkt. No. 37-4 at 1. He provided the court with declarations from three other persons incarcerated at Green Bay, attesting to cold temperatures. Dkt. No. 53 (declaration of William Jones); Dkt. No. 54 (declaration of Michael Henderson, attesting that it was very cold in the cells on the night of November 28, 2017); Dkt. No. 55 (declaration of Tommie Carter, attesting that it was very cold in the cells the night of November 28, 2017). One of those individuals also attested

36

that the cell had not been cleaned after the last person had vacated it. Dkt. No. 55 at ¶12.

The inmate observation form has a place on the first page for the identification of "initial property" and any property changes. Dkt. No. 37-4 at 1. Under "initial property," someone has marked the boxes for "Suicide-resistant clothes" and "Security mat." Id. The form indicates that a member of the security staff marked those boxes. Id. There is no indication that there was any property change while the plaintiff was in the cell. The plaintiff points out that in discovery, Van Lanen said it was his practice to put a security smock or clothing in the red security box attached to the lower trap of a cell if an inmate refuses or declines clothing, but that Van Lanen did not do that on November 28, 2017. Dkt. No. 59 at ¶¶80-81 (citing Dkt. No. 39-3 at 4-5).

The plaintiff has raised a genuine issue of material fact as to whether the conditions in his cell while he was on control status deprived him of the minimal civilized measure of life's necessities. According to the plaintiff, he "was completely nude, had no mattress, bedding, toilet paper, soap, washcloth, and the cell had poor ventilation that did not produce warmth, and it was unclean." Dkt. No. 49 at 31. The defendants assert that the plaintiff was offered some of these items but refused them, and that it wasn't extremely cold when the plaintiff was in the cell. The Seventh Circuit has held that an incarcerated person who alleged that he had been exposed to extreme cold for eighteen hours with no access to clothing arguably presented a genuine issue of material fact as to "whether the duration and severity of the cold in [his] cell

was serious enough to implicate the Eighth Amendment." Flores v. O'Donnell, 36 F. App'x at 204, 206-07 (7th Cir. 2002). If the plaintiff was naked in an extremely cold cell for almost twenty-three hours, without clothing, bedding and hygiene items, that could amount a constitutional violation.

But a reasonable factfinder could not conclude that Van Lanen or Retzlaff knew the plaintiff was at a substantial risk of serious harm. Before Van Lanen placed the plaintiff in the control cell, he offered the plaintiff a shower (to clean off the contaminating spray); the plaintiff refused the shower and refused treatment from HSU staff. Van Lanen put the plaintiff in a cell that had running water and a toilet. About three hours later, the plaintiff asked Retzlaff for property items including clothing and a mattress, told Retzlaff he was cold and that the vent in his cell blew cold air and asked to be moved to a clean cell. Retzlaff told the plaintiff he would ask Van Lanen, but Retzlaff never returned. About twelve hours after that, Lieutenant Wickman offered the plaintiff a smock, which the plaintiff refused because Wickman conditioned it on the plaintiff agreeing to not refuse to exit his cell to see HSU staff. It is undisputed that during the plaintiff's twenty-three hours on control status, staff checked on him every thirty minutes; several noted that he talked with them. Dkt. No. 37-4. The plaintiff has not averred that he asked any of the officers who checked on him for clothing or soap, told them he was cold or requested

38

medical attention.[12] Nor does the plaintiff state that he changed his mind about accepting Wickman's conditional offer of a smock.

The plaintiff encourages the court to deduce from the fact that Van Lanen and Retzlaff did not follow up with him that they intentionally subjected him to being naked in a cold, dirty cell with no hygiene items for twenty-three hours. Dkt. No. 49 at 31. Given the fact that immediately after the extraction incident, Van Lanen offered the plaintiff a shower and took him to see medical staff, and that the observation form indicates that the plaintiff was given suicide-resistant clothing and a security mat, the evidence does not fully support this deduction. But even viewing the evidence in the light most favorable to the plaintiff and assuming that Van Lanen and Retzlaff both knew the cell was very cold, knew it was dirty and knew that the plaintiff had changed his mind about washing, the plaintiff has not alleged a constitutionally cognizable harm resulting from their actions.

A plaintiff must do more than "demonstrate a triable fact with respect to the conditions he faces; he must also show that he suffered some cognizable harm from [those conditions], and that the [defendant's] deliberate indifference caused that harm." Gray, 826 F.3d at 1006. The plaintiff alleges that he lost sleep that night, dkt. no. 49 at 31, and he says that standing on his feet,[13]

---

[12] While the defendants state that inmates can always ask for hygiene items, dkt. no. 34 at ¶61, they do not state whether the plaintiff could have been provided clothing or bedding while on control status.

[13] The observation sheet indicates that there was a bed in the cell, because some of the officers who checked on the plaintiff described him as sitting on the bed. Dkt. No. 37-4 at 3.

39

completely nude with cold air coming in for twenty-three hours "undoubtedly caused [him] pain," dkt. no. 49 at 32. Lost sleep and discomfort, or speculative pain, does not rise to the level of a constitutionally recognizable injury. Two of the incarcerated persons who provided declarations indicated that when they first tried to speak to the plaintiff while he was in controlled separation, he asked them to give him a minute because he was in pain from the asthma attack caused by the chemical spray. Dkt. No. 54 at ¶10; Dkt. No. 55 at ¶8. But Van Lanen took the plaintiff to the medical staff; he could have asked for examination and treatment for the asthma attack but insisted—repeatedly and loudly—that he did not want it.

The plaintiff has not demonstrated that Van Lanen and Retzlaff were deliberately indifferent to a serious risk of harm. The court will grant summary judgment in their favor on the conditions-of-confinement claim.

## III. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 32.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within thirty days of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good

40

cause or excusable neglect for not being able to meet the thirty-day deadline. See Fed. R. App. P. 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Fed. R. Civ. P. 60(b). Any motion under Fed. R. Civ. P. 59(e) must be filed within twenty-eight days of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Fed. R. Civ. P. 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 23rd day of September, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**

41